UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| CHAD ALLEN MELLAND, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 1:11-cv-00223-NT |
| | ) | |
| SOCIAL SECURITY ADMINISTRATION COMMISSIONER, | ) ) | |
| | ) | |
| Defendant | ) | |

## REPORT AND RECOMMENDED DECISION

The Social Security Administration found that Chad Allen Melland has severe impairments but retains the functional capacity to perform substantial gainful activity, resulting in a denial of Melland's application for disability benefits under Title II and Title XVI of the Social Security Act. Melland commenced this civil action to obtain judicial review of the final administrative decision. Melland contends that the administrative law judge erred by not accepting the opinion of the medical expert who testified at his hearing. I recommend that the Court affirm the administrative decision.

### THE ADMINISTRATIVE FINDINGS

The Commissioner's final decision is the December 21, 2010, decision of Administrative Law Judge John Melanson because the Decision Review Board did not complete its review during the time allowed. The ALJ's decision tracks the familiar five-step sequential evaluation process for analyzing social security disability claims, 20 C.F.R. §§ 404.1520, 416.920. (R. 1-17, Doc. No. 8-2.[1])

Melland met the insured status requirements of the Social Security Act through June 30,

---

[1] The Commissioner has consecutively paginated the entire administrative record ("R.") and filed it on the Court's electronic docket in a series of attachments to docket entry 8.

2010. (R. 9, ¶ 1.) At step 1 of the sequential evaluation process, the ALJ found that Melland has not engaged in substantial gainful activity since February 1, 2005, the date of alleged onset of disability. (R. 9, ¶ 2.) At step 2, the ALJ found that Melland has two severe mental impairments, personality disorder and polysubstance abuse. (R. 10, ¶ 3.) The ALJ identified a number of additional mental conditions, but found that these conditions were not medically established because the associated diagnoses were offered when Melland was in a protracted period of substance abuse. (R. 10, ¶ 3.) Relying on the testimony of an expert psychologist, Ira Hymoff, the Judge found that Melland's affective and anxiety disorders were not medically determinable because "a diagnosis of an affective disorder or an anxiety disorder made in the context of ongoing polysubstance abuse or in the absence of an extended period of sobriety is a mere rule out diagnosis." (R. 11.) The ALJ otherwise rejected Dr. Hymoff's opinion that Melland nevertheless suffered marked limitation in each of the "paragraph B" areas of mental functioning. (Id. at 11-12.) The ALJ also rejected an opinion by Dr. Hymoff that Melland likely was in a period of sustained remission while in prison between May and August of 2010, and thereafter. (R. 12.) The ALJ rejected that opinion because, in his words, they were based on:

1. a self-assessment by an individual who has had a long term dependence on alcohol and contraband drugs,
2. who previously was not forthright with treating sources about his ongoing substance abuse,
3. who risks incarceration for a violation of probation if he admits to alcohol use or contraband substance use during the pendency of his probationary term, and,
4. there is no corroborating independent drug testing of record.

(Id.) Additionally, the ALJ found: "Most reliably, the bulk of treating medical sources noted normal mental status examinations, which are found longitudinally throughout the record (e.g., Exhibits 5F/4, 14F/5-6, 15F/1, 17F/4, and 18F/8)." The ALJ acknowledged instances in which this was not the case, but flagged the association these incidents had to substance abuse and

2

specific situational stressors. (R. 12-13.) Ultimately, the ALJ adopted the diagnostic assessment of Donna Gates, Ph.D., who performed a consultative examination and wrote a report in December 2008 in which she diagnosed antisocial personality disorder. (Ex. 5F, R. 404.) The ALJ also agreed with non-examining, consulting physicians that Melland suffers mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace, but that he can carry out simple tasks, interact appropriately with coworkers and supervisors, but not with the public, and could adapt to minor or occasional changes in routine. (R. 14; see also Thomas Knox, Ph.D., mental RFC assessment (Ex. 9F); David Houston, Ph.D., mental RFC assessment (Ex. 12F).) At step 3, the Judge found that this combination of impairments would not meet or equal any listing in the Commissioner's Listing of Impairments, Appendix 1 to 20 C.F.R. Part 404, Subpart P. (R. 15, ¶ 4.)

Prior to further evaluation at steps 4 and 5, the Judge assessed Melland's residual functional capacity (RFC). The ALJ found that Melland can work at all exertional levels and that, despite severe mental limitations, remains capable of simple, repetitive work involving only minor changes in routine, including work with coworkers and supervisors in small groups, but not work involving the public. (R. 16, ¶ 5.) The ALJ's decision does not provide a discussion of the RFC under this heading, though he does discuss his RFC finding under the step 2 heading, outlined above.

Because Melland has no past relevant work, the evaluation of disability was made at step 5. Melland was born in 1974, has a high school education, and can communicate in English. (R. 16, ¶¶ 7, 8.) The ALJ presented a vocational expert with this vocational profile and the RFC finding and found, based on the vocational expert's hearing testimony, that Melland could still

engage in other substantial gainful employment, including in the representative occupations of garbage collector, sandwich board carrier, and escort vehicle driver. (R. 17, ¶ 10.) This finding resulted in a conclusion that Melland had failed to prove that he was under a disability between February 2005 and the date of the ALJ's decision. (R. 17, ¶ 11.)

### DISCUSSION OF PLAINTIFF'S STATEMENT OF ERRORS

Melland does not challenge the finding that he has not established a severe physical impairment. His challenge focuses entirely on the assessment of his mental impairments. In his view: "The medical evidence, in particular the testimony of the ME, establishes that Mr. Melland is and has been disabled since at least May 2010." (Statement of Errors at 2, Doc. No. 10.) According to Melland, the ALJ should have accepted the opinion of the testifying medical expert, failed to adequately explain why he did not do so, misrepresented what the testifying expert said, substituted his lay opinion for the expert opinion, and made findings regarding Melland's mental RFC without a substantial evidentiary basis. (Id. at 3-10.) Additionally, Melland contends that a remand is warranted because the ALJ refused to let his counsel pose alternative hypothetical questions to the vocational expert. (Id. at 10-11.) These arguments are taken in reverse order. This case has an atypical appearance, but following a review of the record I conclude that the ALJ did not commit a reversible error and weighed the expert opinion of record in a legitimate fashion.

**1.      Refusal to Allow Counsel to Pose Hypotheticals to the Vocational Expert**

After the ALJ posed his hypothetical to the vocational expert, he allowed Melland's counsel to question the vocational expert. (R. 66-68.) In response to counsel's questions, the vocational expert allowed that a "marked" limitation in one's ability to complete a normal workday without interruption from psychological symptoms, to perform at a consistent pace

without an unreasonable number or length of rest periods, and to respond appropriately to criticism and get along with coworkers would "eliminate . . . essentially all work." (R. 66-67.) However, when counsel proceeded to reword his questions to entail a "moderate" level of difficulty, the ALJ stopped counsel short and disallowed the question because of the indeterminate nature of a "moderate" description and the need for counsel to pose his question for the vocational expert by specifying a capacity or limitation in function-specific terms. (R. 67-69.) The ALJ indicated that he would not allow a question phrased in terms of a "moderate" restriction, but would allow a question cast in RFC terms. (R. 68.) Counsel did not rephrase his inquiry in that fashion.

The ALJ advised counsel correctly. It is not proper to ask the vocational expert about a "moderate" versus "marked" limitation in a broad area of functioning. Instead, questions directed to a vocational expert need to be put into residual functional capacity terms. For example, rather than asking about the vocational impact of a moderate social limitation related to supervisors and coworkers, the question would address the impact of no coworker interaction or only incidental coworker interaction or a need to work independently of others. See, e.g., Furr v. Astrue, Civ. No. 08-434-P-S, 2009 U.S. Dist. Lexis 105856, *5-7, 2009 WL 3336113, *2-3 (D. Me. Oct. 15, 2009) (Rec. Dec., adopted Nov. 12, 2009) (discussing the distinction in relation to the "summary conclusions" section versus the "functional capacity assessment" section of the Commissioner's mental RFC assessment form).

2. **Resolution of Conflicts in the Medical Expert Opinion**

As Melland argues, Dr. Hymoff's testimony favored a finding of disability, including based on a listing analysis. According to Melland, the ALJ should have accepted Dr. Hymoff's opinion in light of his medical expertise, social security disability expertise, and the fact that he

5

was the only expert to hear Melland testify and consider exhibit 17F. Melland says: "The essence of this case is that the ALJ simply refused to accept that there had been a period of sobriety starting in May 2010" and Melland argues that there is no substantial evidence supporting this critical finding. (Statement of Errors at 6.) Melland maintains that the question of whether he was in remission, like any other medical issue, is one that is reserved for the medical experts and cannot be based on lay inferences alone. (Id. at 7.) I am not persuaded that the period of sobriety question is one that a lay person cannot analyze as the ALJ did. Melland's argument is designed to shift the burden to the ALJ to disprove a period of sobriety, something that does not correspond with the legal allocation of the burden of proof to claimants through step 4 of the sequential evaluation process. Moreover, for reasons that follow, I do not believe that this case turns entirely on the ALJ's rejection of the alleged period of sobriety.

The record reveals that, even as of the hearing date, there was no treating source opinion of record contradicting the ALJ's assessment of Melland's residual functional capacity. Rather, it reveals that Melland has had an Acadia Hospital diagnosis of mood disorder, not otherwise specified, since at least 2006. That diagnosis has coincided with diagnoses of chemical dependency, both for alcohol and opioids. The record also discloses cannabis dependence. (Exs. 1F, 15F.) The mood-related symptoms are associated with the fact that Melland suffered traumatic experiences as a child and has experienced significant situational stressors in adulthood (*e.g.*, Ex. 14F). The record also indicates that Melland is able to maintain relationships with persons he values, including with two young children, an ex-wife, and some supportive friends. (Ex. 15F, R. 480.) Historically, Melland has not placed much value in his work relationships. (Ex. 1F.) In connection with the instant action, Melland places primary emphasis on social and

concentration limitations arising from an antisocial mood.[2]

The development of Melland's social security file proceeded, as one would expect, with a consultative examination with a Disability Determination Services consulting physician. On December 1, 2008, Donna Gates, Ph.D., conducted her evaluation. In her background information, Dr. Gates noted that Melland had been out of work since the motor vehicle accident and that he reported full-time work in construction for the five years prior to the accident. Melland related to Dr. Gates that "he has been fired frequently due to his attitude, and disrespect toward others." (Ex. 5F, R. 402.) His criminal history at the time of Dr. Gates's evaluation included convictions for assaults and OUIs. (Id.) Dr. Gates also recorded a statement by Melland that he regarded his post-accident physical changes (*e.g.*, numbness in his hands) to be the primary reason why it would be difficult for him to work. (R. 404.) Dr. Gates recorded her Axis I diagnosis a PTSD features (nonclinical) and gave antisocial personality disorder as an Axis II diagnosis. Her narrative comments include the following:

> He was in an automobile accident, but did not endorse symptoms suggestive of a clinically significant cognitive disorder. He has noted some changes in his short-term memory, and he writes things down to compensate. He appears to have a great deal of difficulty on the job due to his personality functioning. His willingness to follow work rules is likely to be compromised by disregard for social norms. His ability to relate well to coworkers supervisors and the public is compromised by his antisocial personality style. He appears to have poor social judgment. He likely can manage a mild level of work-related stress and function independently on simple jobs. He can maintain his personal appearance. Mr. Melland appears to have a lot of moodiness and irritability.

(Id.) The assessment of Melland's claim proceeded with a review by Thomas Knox, Ph.D., and a review for reconsideration purposes by David Houston, Ph.D., both of whom reviewed the medical records and provided their assessments on the Commissioner's psychiatric review

---

[2] Melland was in a significant motor vehicle accident in March of 2007 or 2008. (Ex. 3F, R. 382; Ex. 4F, R. 393.) There is also an indication that he tried professional boxing for a while and that he has been in physical altercations that have led to criminal difficulties. (Ex. 1F, R. 320.) Despite this, there is no clinical indication in the medical records that any functional mental limitation arises secondary to physical trauma to the head.

7

technique (PRT) and mental RFC forms. They identified personality disorder as the relevant category for making a medical disposition and assessed moderate social limitations and moderate concentration, persistence, and pace limitations. (Exs. 8F, 11F.) In their summary conclusions, both physicians assessed marked limitations with regard to the ability to carry out detailed instructions and the ability to interact appropriately with the general public. Both also assessed moderate limitation in relation to sustained concentration and persistence, social interaction, and adaptation. However, both also indicated in their narrative functional capacity assessments that Melland can be expected to understand, remember, and persist at simple tasks over a normal workday and workweek. They also assessed that Melland can be expected to get along inside small work groups (co-worker and supervisor), but could not tolerate interaction with the general public. (Exs. 9F, 12F.) Neither saw any evidentiary basis to infer impairment at the listing level.

In between Dr. Knox's March 2009 assessment and Dr. Houston's July 2009 assessment, Melland's primary care provider treated Melland for certain complaints and recorded a report by Melland that he has been subjected to intermittent abuse in an adult relationship and "recently moved out." (Ex. 10F, R. 436.) Dr. Houston noted the record on his forms. There is no subsequent indication in the medical records that this particular disclosure formed the basis for a new diagnosis.

Since Dr. Houston's assessment, the record has come to include an August 2009 discharge summary from Acadia Hospital, giving discharge diagnoses of mood disorder, not otherwise specified, rule out post-traumatic stress disorder, and alcohol dependence and opiate iatrogenic dependence, rule out abuse. (Ex. 15F.) The discharge summary pertained to an admission "for suicidal ideation and a significant suicide attempt by overdose." (R. 480.) The discharge prognosis: "Good with continued outpatient supports." (Id.) Melland left with an

8

intention to continue outpatient services through his primary care provider and "to go ahead with filing for divorce from his current wife." (Id.) The admission assessment indicated a suicide attempt based on ingestion of an overdose of his estranged wife's metformin medication, in her presence. (R. 484.) In addition to this development, Melland was incarcerated in May 2010 for approximately four months. The record suggests that the crimes of conviction were burglary, criminal trespass, and theft, but it is not stated when the underlying events occurred. (Ex. 17F, R. 501.) Upon release from jail, Melland presented at Acadia Hospital for medication management. (R. 499.) He underwent an evaluation with Vijay Amarendran, M.D. Dr. Amarendran noted a report by Melland that he had not used any substances since his release from jail. (R. 501.) Dr. Amarendran diagnosed mood disorder, not otherwise specified, alcohol dependence in full early remission, and cannabis dependence in full early remission. (R. 503.)

At his hearing, Melland testified that he held trustee status while in jail and that he could not have maintained that status without passing drug tests. (R. 53-54.) Melland contends that his trustee status, his current probationary status, the notes and opinions of his substance abuse counselor, and the "in early remission" assessment given by Dr. Amarendran all establish an appreciable period of sobriety that makes the mood disorder diagnosis in exhibit 17F more than a mere "rule out" diagnosis. (Statement of Errors at 6.) Dr. Hymoff opined that this was a reasonable assessment of the circumstances. (R. 50-52.) He also testified:

> I'm not sure I agree totally with Dr. Houston's assessment, but I'm unsure. I think by testimony and by the other medical records, to me would indicate a more serious—those B criteria would be more seriously affected than Dr. Houston. So I don't know what the date of his assessment was. It was in '09, 7/28/09. Didn't have some of these more recent on the record.
>
> Q.  But you said that there's been no change in the symptoms.
>
> A.  Right, right.

9

(R. 56.) Subsequently, Dr. Hymoff testified that he considered Melland's subjective reports to describe marked limitations and he opined that there was a listing level of impairment, but also that with continued abstinence and treatment there was reason to believe that disability would not persist. (R. 61-64.)

Melland argues that the introduction of Dr. Amarendran's report at the hearing and Dr. Hymoff's testimony preclude the outcome that the ALJ arrived at. Although I appreciate this argument and certainly see it as a possible outcome, based on my review of the record I do not believe that Dr. Hymoff's opinion dictates that outcome. In particular, I agree with the Commissioner's position at oral argument, that a reasonable mind could reject Dr. Hymoff's testimony that there is objective evidence of a listing-level mental impairment. Dr. Gates, after all, evaluated Melland when Melland was not in sustained remission from substance abuse and her report does not correspond with a listing-level impairment. Dr. Knox and Dr. Houston understood her evaluation to indicate moderate rather than marked limitations in social functioning and concentration, persistence, and pace. Their view appears reasonable, as does the ALJ's reliance on them. When coupled with the normal mental status examinations reported by other physicians in the record, there is a substantial evidentiary basis in support of the ALJ's decision to reject a listing-level mental impairment. Dr. Hymoff allowed that it would be reasonable to view these normal mental status examination notes as inconsistent with a finding of marked limitations, even if he expressed the view that he would see Melland's condition as more severe than what Dr. Houston assessed.

> When you look at, for example, 18F, he has—typically on physical examinations, he's described as alert and cooperative, normal mood and appetite, normal attention span and concentration.
> . . .
> ME:   Yeah, just a moment. I guess there's inconsistencies there.

> . . .
>
> A. Well, I mean the way I look at it is, the Acadia notes are really detailed and pretty descriptive, and pretty complete. . . .
>
> Q. Okay, but you're still not answering my question. In the literature, if you have normal mental status exams, is that inconsistent with marked complaints of marked limits in concentration or social anxiety?
>
> A. It is inconsistent.

(R. 58-59.)

Melland also argues that the ALJ could not exclude mood disorder as a severe impairment because Dr. Hymoff expressed that he agreed with the diagnosis found in exhibit 17F based on his assumption that Melland could not have abused substances in jail and had not done so after release because of potential drug testing related to probation. (R. 51-52.) Without a period of sobriety, however, Dr. Hymoff opines that a diagnosis of mood disorder is only a "rule out" diagnosis, the very reason why the ALJ treated mood disorder as not medically established on this record. Moreover, even assuming that the mood disorder diagnosis was erroneously excluded at step 2, Dr. Hymoff agreed with the view that the new records did not describe new symptoms. (R. 56.) With this specific testimony in mind, the ALJ reasonably placed his faith in the expert assessments offered by Drs. Gates, Knox, and Houston, notwithstanding later developments.

Melland argues that the ALJ decision is still based on reversible error because the ALJ failing to explain why he accepted the assessment regarding social functioning offered by Dr. Knox and Dr. Houston, despite the fact that Dr. Gates, upon whom they relied, indicated that Melland would be socially limited with coworkers and supervisors as well as the public. (Statement of Errors at 8.) Melland notes that Dr. Hymoff's testimony was to the effect that there would be marked social difficulties. (Id., citing R. 58-63.) Melland argues that, in

11

choosing to accept the consulting physicians' opinions over the opinion of the testifying medical expert and the examining consultant, the ALJ failed to "follow or refer to the criteria in 20 C.F.R. §§ 404.1527 and 404.927" or "explain the contradictions between the State Agency Psychologists and the consulting examiner upon whose data their opinions were largely based." (Id. at 9.) In Melland's view: "Dr. Hymoff had an opportunity to review evidence not available to them, had an opportunity to at least observe the claimant, and was able in the hearing format to offer a far more complete and cogent explanation for his conclusions." (Id. at 9-10.)

The Commissioner is tasked specifically to take and consider medical evidence and to resolve conflicts in the evidence. So long as his resolution of conflicts is one that a reasonable mind could accept as adequate, the Court must uphold the decision. Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). For the reasons already indicated, I cannot say, based on my review of the record and the ALJ's decision, that a reasonable mind could not accept the ALJ's reasoning as adequate. Dr. Gates had an opportunity to examine and evaluate Melland in person—as did the ALJ at the hearing—and Dr. Knox and Dr. Houston, both trained in social security disability standards, understood Dr. Gates's report of symptoms to correspond with a limited social capacity, but not one that would preclude all work alongside coworkers and supervisors. Dr. Houston, in particular, indicated that Melland could be expected to work with others in "small groups" if his work was simple and did not require public interaction. (Ex. 12F.) Moreover, Dr. Hymoff testified that the more recent record development does not disclose new symptoms and this left room for the ALJ to rely on Dr. Houston's RFC assessment to support his RFC finding. That finding was based not merely on Dr. Houston's opinion, but also on an independent assessment of the longitudinal record and credibility considerations, none of which was manifestly unreasonable.

**CONCLUSION**

For the reasons set forth in the foregoing discussion, I RECOMMEND that the Court affirm the Commissioner's final decision and enter judgment in favor of the Commissioner.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

April 26, 2012